**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jeffrey Scott MacDONALD,
Defendant-Appellant.**

**No. 80–1466.**

United States Court of Appeals,
Tenth Circuit.

Feb. 12, 1982.

Rehearing Denied April 12, 1982.

Larry Steven Pozner, Denver, Colo., for defendant-appellant.

R. E. Thompson, U. S. Atty., and James F. Blackmer, Asst. U. S. Atty., Albuquerque, N. M., for plaintiff-appellee.

Before BARRETT, McKAY and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

Jeffrey Scott MacDonald appeals his conviction for possession of cocaine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1). He contends that the government obtained certain physical evidence and oral statements in violation of his Fourth Amendment rights, and that the trial court erred in refusing to suppress that evidence and those statements. By agreement, the parties have submitted this case on the briefs.

On January 15, 1980, MacDonald boarded a commercial air flight from Fort Lauderdale, Florida to Albuquerque, New Mexico. Unbeknownst to MacDonald, he sat next to Thomas Dyle, a Drug Enforcement Administration (DEA) agent of ten years' experience, who was stationed in Florida and was knowledgeable about the smuggling of drugs by commercial aircraft. Although Dyle was traveling to Albuquerque on business unrelated to MacDonald, based on observations and conversations with him, Dyle soon became suspicious of MacDonald. When the plane made an intermediate stop at the Dallas-Fort Worth airport, Dyle contacted local DEA agents and had them relay his suspicions to the DEA in Albuquerque. Upon the plane's arrival in Albuquerque, DEA agents and the Albuquerque police began surveillance of MacDonald. When MacDonald left the terminal building without picking up his baggage, Detective Q. James Erekson of the Albuquerque po-

lice approached MacDonald and asked him some questions. MacDonald's answers conflicted with the information supplied by Dyle, and the officers then asked .MacDonald to accompany them to the security office.

In the airport security office, DEA Agent Abencio.Cordova and other officers interrogated MacDonald. At one point they conducted a patdown search for weapons and had MacDonald empty his pockets. Cordova kept certain items that were later suppressed by the trial court, but he returned to MacDonald a set of keys, an airline ticket, and $2800 in cash.

As MacDonald accompanied some of the officers to the security office, Detective Erekson attempted but failed to find the ticket MacDonald told Erekson he had left on the plane. Erekson then focused his investigation on MacDonald's baggage. On his way to meet Agent Dyle at the baggage claim area, Erekson sent for a dog trained to sniff-search baggage for the presence of cocaine. Texas International Airlines (TIA) employees had taken the unclaimed baggage to the TIA counter. There, Dyle identified a Samsonite bag as the one he believed MacDonald had picked up and checked at the Dallas-Forth Worth airport. Passengers soon claimed the other remaining bags. TIA employees noticed the Samsonite bag lacked outside identification. Before opening it to try to identify its owner in accordance with airline procedures, they removed it to a back office. Finding no Samsonite key in the office, one of the TIA employees obtained a key from Erekson. On a piece of paper inside the bag, the airline employees found MacDonald's name; they gave this information to Erekson and reclosed the bag. Erekson took the bag to the security office area where the cocaine-detecting dog alerted on it twice. The officers then formally arrested MacDonald and searched him incident to the arrest. Thereafter, they obtained a search warrant and opened the bag, finding approximately eighteen ounces of cocaine.

MacDonald asserts that all statements he made and all evidence obtained from him or his baggage should have been suppressed because of numerous Fourth Amendment violations: (1) the investigatory stop outside the airport, (2) the search of his bag by TIA employees, (3) the removal of the bag to the security office for a sniff-search, (4) the interrogation in the security office, and (5) the seizure of his keys, ticket, and money incident to arrest. The government not only disagrees with MacDonald's assertions, but also maintains that MacDonald abandoned his bag and therefore has no standing to object to the admission of its contents.

I

MacDonald contends that the police lacked reasonable suspicion of criminal activity when they stopped him outside the airport. The government responds that the police encounter with the defendant outside the airport was merely a contact, not a stop, but that if it was a stop, the police reasonably suspected criminal activity. The trial court found it was a valid stop because the circumstances gave rise to a reasonable suspicion of criminal activity.

■■ Considering it as a stop, we agree with the trial court that it was valid, and therefore we need not decide if the limited questioning was "a mere contact" to which a lesser standard would apply. *See United States v. Mendenhall*, 446 U.S. 544, 551–57, 100 S.Ct. 1870, 1875–1878, 64 L.Ed.2d 497 (1980) (Stewart, J., concurring). In order to stop an individual, a police officer must have reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–1880, 20 L.Ed.2d 889 (1968). The reasonableness of an investigative stop depends on the facts and circumstances of each case with particular attention to "(i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and expertise." *Mendenhall*, 446 U.S. at 561, 100 S.Ct. at 1881 (Powell, J., concurring); *accord, Terry*, 392 U.S. at 20–22, 88 S.Ct. at 1879–1880.

Addressing these three factors, we believe the public interest served by asking a few questions was high and the intrusion quite modest. *See Mendenhall*, 446 U.S. at 561–63, 100 S.Ct. at 1881–82 (Powell, J., concurring). The issue the parties sharply dispute is whether the officers had objective facts they could rely upon to justify the stop. In assessing whether the grounds for a stop were adequate, courts should not ignore the considerable expertise that law enforcement officials have gained from their special training and experience. *Id.* at 563–64, 100 S.Ct. at 1881–82; *Brown v. Texas*, 443 U.S. 47, 52 n.2, 99 S.Ct. 2637, 2641 n.2, 61 L.Ed.2d 357 (1979); *United States v. Leyba*, 627 F.2d 1059, 1062 (10th Cir.), *cert. denied*, 449 U.S. 987, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980).

At the time Detective Erekson questioned defendant MacDonald outside the Albuquerque terminal, the officers had several reasons to be suspicious. MacDonald had told Dyle he was flying standby to Albuquerque, but he had checked his bags only to Dallas-Fort Worth. At the Dallas-Fort Worth airport, Dyle watched MacDonald pick up his bag and immediately check it in with TIA. Dyle recognized that the checking of baggage to intermediate points in a trip is a technique drug couriers use to inhibit police investigation. In the Texas airport Dyle learned that MacDonald had paid cash for his Fort Lauderdale to Albuquerque ticket and that flight to Albuquerque on standby status was unnecessary because plenty of seats were available. MacDonald also had told Dyle he had spent the last three or four days at Key Largo for a friend's wedding, but although it was midwinter MacDonald was well-tanned, as if he had spent more than four days at Key Largo.

Agent Dyle knew Key Largo and southern Florida were major sources of cocaine trafficking. He knew the Miami airport, with more and better flight connections to Albuquerque and Dallas-Fort Worth, was thirty to forty miles closer to Key Largo than the Fort Lauderdale airport, and that the more distant airport had less-extensive drug detection procedures than the Miami airport. Finally, when MacDonald arrived in Albuquerque, the officers observed that he was nervous and did not approach the baggage claim area but directly left the terminal.

We agree with the trial court that these facts and circumstances gave the officers a reasonable suspicion of criminal activity, and therefore they were justified in making a limited stop and questioning the defendant outside the airport. The cases upon which MacDonald relies are distinguishable. The facts known to the officers here go far beyond the anonymous tip in *United States v. Ballard*, 573 F.2d 913 (5th Cir. 1978), or the three defendants' nervousness, short trip, and joint possession of a single suitcase in *United States v. McCaleb*, 552 F.2d 717 (6th Cir. 1977). The suspicions were not merely based on the type of flight MacDonald took and his limited baggage, or other circumstances describing a very large category of presumably innocent travelers. *See Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). The court properly held the investigatory stop did not require suppression of the statements and evidence that resulted from the stop.

## II

We next address the propriety of the police activities regarding the baggage.[1]

---

1. The government contends that MacDonald abandoned his bag and lacks standing to move for the suppression of its contents. The trial court held that MacDonald had automatic standing because the government charged him with a crime having possession as one of its elements. Since the trial, the Supreme Court has overruled its automatic standing cases. *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rawlings v. Ken-*

*tucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Even though the trial court did not rely upon it, the government asks us to consider the abandonment theory as an additional ground for supporting the judgment. *See Dandridge v. Williams*, 397 U.S. 471, 475 n.6, 90 S.Ct. 1153, 1156 n.6, 25 L.Ed.2d 491 (1970). Apparently believing that he had automatic standing to urge suppression, MacDonald never attempted to meet his burden of establishing

Although MacDonald did not raise the issue at trial, he now contends that moving his bag to the security office area for a sniff-search constituted an unlawful seizure. MacDonald recognizes this Circuit's holding that use of a trained dog to sniff for contraband without trespassing is not an unreasonable search within the meaning of the Fourth Amendment. *See United States v. Venema*, 563 F.2d 1003, 1005–06 (10th Cir. 1977). However, he maintains that the agents violated the Fourth Amendment by taking the bag to the security office area for the sniff-search.

■ The government argues both that MacDonald failed to raise this issue at trial, and that the argument is without merit. We agree with both of the government's contentions. Other courts that have addressed the substantive issue have held that so long as the police reasonably suspect criminal activity, they may temporarily detain baggage or move it to permit examination by a drug-detecting dog without violating the baggage owner's Fourth Amendment interest in privacy. *United States v. West*, 651 F.2d 71, 74 (1st Cir. 1981); *United States v. Viegas*, 639 F.2d 42, 54 (1st Cir.), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981); *United States v. Goldstein*, 635 F.2d 356, 361–62 (5th Cir.), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981); *United States v. Klein*, 626 F.2d 22 (7th Cir. 1980). *Cf. United States v. Van Leeuwen*, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970) (police may temporarily detain suspicious packages sent by United States mail). We agree with this general rule. In the discussion outside the Albuquerque airport, MacDonald told the agents he had no baggage, in direct contradiction to Agent Dyle's observations at the Dallas-Fort Worth airport. Together with the officers' other observations and MacDonald's additional statements on the plane and outside the airport,

the officers could reasonably suspect the bag contained contraband, and therefore could temporarily detain and remove it for the dog's sniff-search.

### III

■ Defendant MacDonald also objects to the government's involvement in the airline's search of his bag before Detective Erekson took it to the security office. Although Erekson and one of the TIA employees testified that the airline employees instigated and conducted the search solely for the airline's purposes, they agree that when the TIA employees found they had no key that fit the bag, Erekson supplied one. We need not determine whether the government's interest and involvement subjected the search to Fourth Amendment protections. Even if the search was illegal because of government involvement, it yielded nothing to be suppressed. The TIA employees saw no contraband and told Erekson only that the name "MacDonald" appeared on a piece of paper inside the bag. The police did not need the name of the bag owner—Agent Dyle had already identified the bag, and it was the only one not yet claimed. At trial the government introduced no evidence of the bag being opened by the TIA employees. In addition, the government agents had sent for the drug-detecting dog before the bag was opened. Whether or not government agents illegally assisted the airline's search, it did not taint the later sniff-search.

### IV

We also need not reach MacDonald's assertions that the government agents illegally seized him when they took him to the airport security office for further questions. MacDonald does not complain that statements he made or evidence the police discovered only during this interrogation were

---

that he had a reasonable expectation of privacy in the suitcase. Furthermore, neither at trial nor in this Court on appeal did MacDonald address the government's theory of abandonment. If we were to agree with the government on only this issue, we would remand this

action to permit further proceedings on the abandonment issue, but our resolution of the case makes a remand unnecessary. *See Combs v. United States*, 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972).

used to establish probable cause for the search warrant, were introduced at trial, or in turn led to the discovery of other evidence. In particular, the police did not discover the suitcase or its contents as a result of questioning MacDonald.

V

Finally, MacDonald maintains that when the officers made MacDonald empty his pockets during the security office interrogation, it was an unlawful search and, even though the police returned to him some of the items they had discovered, they could not later arrest him and legally confiscate those items during a search incident to his arrest. The trial court agreed that the police had no legally sufficient reason to require MacDonald to empty his pockets. But the trial court suppressed only those items seized from MacDonald that were not returned to him. The trial court concluded that the keys, an airline ticket, and $2800 in cash—the items the officers had returned to MacDonald—were properly seized the second time, as incident to MacDonald's arrest. At trial, the government introduced the key to the Samsonite bag and the airline ticket.

Generally, evidence seized during an unlawful search or indirectly obtained because of an illegality are "fruits" of the unlawful action and not admissible against the victim of the search. *Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963). However, even when a search is illegal, the courts will permit the evidence to be admitted if the search is justifiable on some other ground. *Id.* at 485, 83 S.Ct. at 416 (quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920).

Independently discovered evidence gave the police probable cause to arrest MacDonald and search him incident to the arrest, thereby purging any taint the security office search imposed upon the evidence MacDonald challenges here. Completely apart from the interrogation and search in the security office, the police knew of Mac-

Donald's suspicious activities and inconsistent statements, and the drug-detecting dog had alerted twice on MacDonald's bag. On this independent basis the agents arrested MacDonald, seized his keys, ticket, and cash in a search incident to arrest, and applied for the search warrant for his bag. While the distinction the trial court drew between items returned and items not returned to MacDonald was probably unnecessary, it properly allowed the introduction of the returned items.

The trial court correctly refused to suppress the evidence challenged here.

AFFIRMED.